IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANNA EDGELL,

       Plaintiff,

vs.                                                                    No.  06cv0352 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Edgell's) Motion to Reverse or Remand for a Rehearing **[Doc. No. 11]**, filed September 6, 2006, and fully briefed on October 25, 2006.  On July 13, 2005, the Commissioner of Social Security issued a final decision denying Edgell's claim for disability insurance benefits.  Edgell seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is not well taken and will be DENIED.

## I.  Factual and Procedural Background

Edgell, now forty-seven years old (D.O.B. October 14, 1959), filed her application for disability insurance benefits on December 4, 2003 (Tr. 53), alleging disability since July 18, 2001 (*Id.*), due to asthma, carpal tunnel syndrome, arm problems, diabetes, obesity (Tr. 29), liver problems (Tr. 81), high blood pressure, and knee pain and swelling from a torn ligament (Tr. 86). Edgell has a high school education and past relevant work as a janitor, grocery store stocker, and

customer representative.  Tr. 13, 118.  On July 13, 2005, the Commissioner's Administrative Law

Judge (ALJ) denied benefits, finding Edgell was not disabled as she retained "the residual

functional capacity (RFC) to perform sedentary work with option to sit and stand as needed, no

overhead reaching and no work around chemicals, dust, or smoke.  Tr. 17, 19.  The ALJ further

found Edgell's "allegations regarding her limitations [were] not totally credible."  Tr. 19.  Edgell

filed a Request for Review of the decision by the Appeals Council.  On April 12, 2006, the

Appeals Council denied Edgell's request for review of the ALJ's decision.  Tr. 6.  Hence, the

decision of the ALJ became the final decision of the Commissioner for judicial review purposes.

Edgell seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether she applied correct legal standards.

*Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

2

evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand, Edgell makes the following arguments: (1) the ALJ erred in adopting the vocational expert's testimony; and (2) the ALJ failed to consider her obesity and its effects.

## A.  Medical Records

On July 16, 2001, Alan Altman, M.D., evaluated Edgell for left knee pain.  Tr. 277. Edgell reported lifting a bag of groceries then twisting and rotating to the right and hearing a pop in the back of the left knee.  Edgell complained of continued pain in the posterior aspect of the knee.  The standing left knee x-rays were negative.  The MRI showed a definite ACL (anterior cruciate ligament– major stabilizing ligament of the knee) tear.  Dr. Altman assessed Edgell with left ACL tear.  Dr. Altman scheduled an arthroscopy and a left ACL reconstruction with the medial hamstring.  Tr. 278.

On July 26, 2001, Dr. Altman performed an arthroscopic ACL reconstruction with double medial hamstring of the left knee. Tr. 275.  On August 3, 2001, Dr. Altman removed the sutures and prescribed Percocet for pain.  Dr. Altman directed Edgell to return in three weeks.

On August 24, 2001, Edgell returned to see Dr. Altman.  Tr. 274.  Dr. Altman opined Edgell was doing fine and would be unable to return to work for at least two more months.  On August 27, Dr. Altman provided Edgell with a "To Whom It May Concern" letter stating Edgell would be off work from July 18, 2001 to October 24, 2001.  Tr. 273.

On September 24, 2001, Edgell returned for a two month post operative follow up with Dr. Altman.  Tr. 272.  Dr. Altman noted Edgell was tender along the medial hamstring.  Dr. Altman recommended Edgell continue with physical therapy.

On October 24, 2001, Edgell returned to see Dr. Altman.  Tr. 271.  The physical examination revealed medial and lateral patellar pain and medial lateral joint line tenderness.  Dr. Altman noted "some fibrosis about the patellar mechanism with poor mobility."  *Id.*  Dr. Altman assessed Edgell with "postoperative adhesions, left knee" and scheduled her for an "arthroscopy and lysis of adhesions, left knee."  *Id.*  Dr. Altman opined Edgell could work sedentary duty for about four hours every day.  Dr. Altman performed the arthroscopy and lysis of adhesions on November 7, 2001.  Tr. 270.  Dr. Altman advised Edgell to stay out of work for at least 4-6 weeks postoperatively.

On November 19, 2001, Edgell returned to Dr. Altman for a postoperative follow up.  Tr. 268.  Dr. Altman removed the sutures and advised Edgell to continue with physical therapy for another nine days.  Dr. Altman directed Edgell to weight-bear as tolerated.  Edgell did not require any pain medication.  Dr. Altman noted an estimated MMI (maximum medical improvement) for the ACL at about six months.  Dr. Altman also noted:

> Work status: Patient would be able to return to work in about four or five days, sedentary. She can walk and sit about four hours each in the course of a day.  She is not to do any bending, squatting, ladders or stairs.  She cannot stock the shelves at Circle K.  She has a 10-20 pound lifting restriction from approximately knee to waist level.
>
> Estimated MMI for the ACL at about six months, although in this particular patient it may be a little longer, as she had a setback due to her adhesions.  We will reevaluate this at the end of January.

Tr. 268.

On December 19, 2001, Dr. Altman reevaluated Edgell five months post-ACL reconstruction.  Tr. 267.  Dr. Altman noted Edgell had "quit her job due to the knee."  *Id.*  Edgell reported she was doing "fairly well" but was still having some swelling.  Dr. Altman's physical examination revealed that motion was 0-120 with some posterior joint tenderness.  Although Dr. Altman noted the knee was "still fairly weak," the ACL was stable and there was no swelling and no effusion.  Dr. Altman continued Edgell on physical therapy and directed her to return in one month.

On January 28, 2002, Edgell returned for a follow up with Dr. Altman.  Tr. 266.  Edgell complained of pain with weight bearing, posterior pain with sitting, and lack of full extension.  Dr. Altman's physical examination revealed that motion was now 5-110, there was tenderness on the medial and lateral side of the patella but a stable ACL with no effusion, and the patellar joint was a "little fibrotic."  *Id.*  Dr. Altman continued Edgell's physical therapy, directed her to return in one month, and filled out a form allowing her to work at sedentary duty.

On March 13, 2002, Edgell went to University Hospital for the first time.  Tr. 261.  Edgell reported she had asthma and also wanted to establish a new primary care provider.  The examination was unremarkable.  The physician prescribed Albuterol for the asthma and directed Edgell to return in one month.

On April 1, 2002, Edgell returned for her follow up with Dr. Altman.  Tr. 265.  Edgell complained of left knee pain with weight bearing and bending.  Dr. Altman noted:

> **OBJECTIVE:** On examination, left knee motion is 0-120, compared with approximately 0-130 on the right.  She has some posterior central tenderness in the knee, but it is somewhat vague.  She has some tenderness over the anterior surgical scar.  She has fair patellar mobility.  The ACL is stable.  Lachman's is negative.  There is no effusion.  She has considerable weakness going up and down just one step.

**ASSESSMENT:** Postoperative weakness left knee.  The patient is not yet at MMI.

**PLAN:** Continue home exercises for now.  We need to add some step-ups and step-downs on a low step, and I demonstrated these.

She can go to **light duty** on 4/8/02, four hours per day for two weeks, six hours per day for two more weeks, then eight hours a day.  She has a 20-pound lifting restriction but may frequently carry objects up to 10 pounds.  I think she can do the cashiering.  She is not allowed to do any squatting, climbing or twisting.  She is allowed to do occasional bending.  Return in one month.

Tr. 265 (emphasis added).

On May 1, 2002, Edgell returned to Dr. Altman for her nine month postoperative follow up.  Tr. 264.  Edgell complained of "swelling all the time, pain with walking."  *Id.*  Edgell also complained of some instability and posterior pain [of the left knee] when she sat and a tightness when she got up, lasting 20 minutes.  Dr. Altman noted:

**OBJECTIVE:** On examination, there is **very mild tenderness** in the lateral joint line and medial parapatellar border.  **There is no effusion**.  Motion is 0-120, which is about 5 degrees short of the other side.  **She has grade 4+ strength.  ACL is stable**.

**ASSESSMENT:**
1.      Stable ACL reconstruction left knee.
2.      Sensation of tightness; this is likely from the adhesions.  **Her motion is actually quite good**, although she does lack a little flexion.
3.      Instability.  This is likely due to some persistent weakness.
4.      Patient has reached MMI.

**PLAN:  We will increase her work restrictions to 40-pound lifting.  She can work 8 hours a day on her feet, but she needs to avoid squatting and bending, and no excessive use of stairs or ladders**.

She has not yet returned to work, but she can start looking for a job.

Return to see me in three months.

Impairment: According to the AMA Guides to the Evaluation of Permanent Impairment, Fifth Edition, the patient carries a 3% impairment to the whole person, which is 7% impairment of the lower extremity, due to the ACL ligament reconstruction.

Tr. 264 (emphasis added).

On May 6, 2002, Edgell returned to University Hospital for her follow up.  Tr. 260.  Dr. Sam Pourbabak evaluated Edgell.  Dr. Pourbabak diagnosed Edgell with asthma, GERD, and obesity.  Dr. Pourbabak directed Edgell to continue using Flovent and Albuterol for her asthma.  Dr. Pourbabak also recommended a pap smear.

On June 17, 2002, Edgell returned to University Hospital for her follow up.  Tr. 256.  At that time, Edgell complained of arm pain and tingling in her fingers.  Dr. Pourbabak examined Edgell, ordered lab work, and directed her to return for the results.  Tr. 256.

On July 8, 2002, Edgell returned for an examination and a pap smear with Dr. Pourbabak.  Tr. 255.  Edgell reported her blood glucose levels were running from 150 to 250.  Dr. Pourbabak increased the Glyburide and directed her to continue monitoring her blood glucose.

On July 26, 2002, Edgell returned to see David B. Kilgore, M.D.  Tr. 254.  Edgell reported her blood sugar levels were running between 250 and 300.  Dr. Kilgore performed an examination which was essentially normal.  Dr. Kilgore advised Edgell to return in one month.

On August 2, 2002, Edgell returned for a follow up with Dr. Altman.  Tr. 263.  Dr. Altman noted Edgell was one year postoperative.  Edgell complained of knee pain with excessive walking but no buckling or instability.  Dr. Edgell noted: "**It is unclear where the pain is coming from.  She has a bit of the "all overs."**  *Id.*  **The standing left knee x-rays were negative**.  Dr. Altman assessed Edgell as having a **stable left ACL reconstruction with no evidence of osteoarthritis.**  Dr. Altman advised Edgell to exercise before taking her first step in order to relieve some of the "startup pain."  *Id.*

On August 23, 2002, Dr. Kilgore evaluated Edgell.  Tr. 253.  Dr. Kilgore ordered "fasting lipids, LFTs (liver function tests), urinalyis, CBC, Hgb A1c (indicates a patient's blood sugar control over the last 2-3 months)."  *Id.*   Dr. Kilgore directed Edgell to return in three months.

On September 26, 2002, Edgell returned to University Hospital for a follow up.  Tr.252. A nurse practitioner evaluated Edgell and assessed her as having uncontrolled diabetes mellitus. The nurse practitioner directed Edgell to continue taking Glyburide and Glucophage for her diabetes.  The nurse practitioner ordered an Hgb A1c and LFTs.  The nurse practitioner also directed Edgell to return in one month for her follow up with her primary care physician.

On October 24, 2002, Edgell returned to University Hospital for a follow up of her diabetes.  Tr. 249.  Edgell also complained of a nonproductive cough.  Edgell's blood glucose level was 58.  A nurse practitioner evaluated Edgell, ordered a Hgb A1c, prescribed cough medication, counseled Edgell on diet and exercise, and directed Edgell to return in December for a follow up.  Edgell's Hgb A1c was 7.6 and her SGPT (liver function test) was 75 (elevated).  Tr. 250.

On December 6, 2002, Edgell went to University Hospital.  Tr. 248.  Edgell complained of having a cough.  Dr. Kilgore ordered laboratory work and a chest x-ray.  Dr. Kilgore directed Edgell to return in three months.

On February 28, 2003, Edgell returned to the Family Clinic at University Hospital for her follow up.  Tr. 246-247.  Edgell reported consistently high blood sugar levels, polyuria, and polydipsia.  Tr. 246.  Edgell also reported she had been to a podiatrist who assessed her as "having no diabetic neuropathy."  *Id*.  Dr. Kilgore performed a physical examination and noted the monofilament exam of the feet was positive at all points on the left, and positive at all points

9

except for two and three on the right.  Dr. Kilgore assessed Edgell as having diabetes.  Dr. Kilgore noted the diabetes was under poor control with evidence of neuropathy based on the monofilament test.  Dr. Kilgore increased the Glucophage to 500 mg.

On May 16, 2003, Edgell returned to University Hospital for a follow up.  Dr. Kilgore noted Edgell was obese and hypertensive.  Tr. 244.  Dr. Kilgore ordered laboratory work, an EKG, a stress echo, and sleep studies.  The liver function tests were normal.  Tr.  However, Edgell's cholesterol was high (211) and her LDL was 143.  Tr. 241.  Edgell's urinalysis was completely normal.  Tr. 143.

On June 13, 2003, Edgell returned to the Family Clinic at University Hospital.  Tr. 238-239.  Dr. Samareh Javadian noted:

> Her highest BG (blood glucose) was 400, but this was because she had some cake and ice cream on that day.  She says that she has been out of Glucophage the last 4 days, so her sugars have been much higher.  She continues to be walking at Wal-Mart 5x/wk for 1 hour, however she is concerned that she is not losing weight and has actually gained 10 pounds in the last 5 weeks.  Her asthma is currently controlled with Advair DPI and Albuteraol MDI p.r.n.  She has not checked her peak flow sine the end of May.  She says that she has continued smoking cessation.  Also, she states that Dr. Kilgore is going to be placing her on cholesterol medication for her high cholesterol next week.

*Id.*  Dr. Javadian assessed Edgell with Type 2 DM (diabetes mellitus), currently uncontrolled.  Dr. Javadian instructed Edgell to continue monitoring and recording her blood sugar levels.  Dr. Javadian encouraged Edgell to continue exercising and recommended she decrease her carbohydrate intake.

On June 27, 2003, Edgell returned to the Family Clinic at University Hospital.  Tr. 235-237.  Dr. Kilgore evaluated Edgell.  Tr. 235-236.  Dr. Kilgore noted Edgell's diabetes was still under moderately poor control.  Dr. Edgell also prescribed prednisone for her asthma.  Because Edgell's cholesteral was 211 and her LDL was 143, Dr. Kilgore started her on Lipitor.

10

On July 28, 2003, Edgell returned to University Hospital for a follow up.  Tr. 232.  Dr. Kilgore ordered laboratory work, an echo stress test, and an EKG.  Tr. 232-234.  Dr. Kilgore noted **Edgell's neuropathy was stable and blood pressure was "controlled on Rx**."  Tr. 232.

On August 5, 2003, Dr. Kieu Nga T, a health care provider with the Department of Family Practice at University Hospital, evaluated Edgell. 230-231.  Edgell complained of stomach problems and diarrhea.  Tr. 230.  Edgell also reported her asthma was better controlled with Advair 500/50.  Dr. Kieu Nga T advised Edgell to modify her diet by taking less carbohydrates and directed her to do weight-bearing or aerobic exercise in order to reduce her blood pressure and the risk of complications from her diabetes.  Dr. Kieu Nga T also instructed Edgell to restart her Advair 500/50.  Tr. 231.

On September 26, 2003, Edgell returned for her follow up.  Tr. 229.  Edgell complained of "bad night vision."  The attending physician diagnosed Edgell with asthma, prescribed Advair 50/500, and referred her for an eye examination.

On October 17, 2003, Edgell returned to the Department of Family Practice at University Hospital for a follow up of her diabetes mellitus, hypertension, and obesity.  Tr. 227-228.  Robert L. Williams, M.D., evaluated Edgell.  Tr. 227-228.  Dr. Williams noted:

> **SUBJECTIVE:**
> This is a 44-year-old female who is here today to follow up on her diabetes mellitus, hypertension, and obesity.  Regarding her diabetes mellitus, she monitors at home and her blood sugars have been in the 120-250 range.  Her most recent hemoglobin A1c is 6.6, which is down from a high 7.8.  **She denies any episodes of neuropathies, paresthesias, or paresis**.  Regarding her hypertension, the patient is on Cozaar.  She denies any episodes of chest pain or transient ischemic attack like symptoms.  She has a stress test and a Cardiolite perfusion scan showing some scant areas of reversible ischemia at the apex, but she has an ejection fraction of 67%.  Regarding her obesity, the patient's weight is stable at 264 pounds.  She has been to the Wellness Center and is walking daily.  She does continue with bilateral lower extremity swelling.

**BJECTIVE:**

Vital signs are significant for a blood pressure of 111/67, weight 263 pounds. **Her capillary blood glucose this morning was 119 at 10:00 a.m.** Laboratories that [were] drawn last time were the above mentioned hemoglobin A1c, Chem-7 was normal, and **liver function tests were normal.** Cholesterol is 163, triglycerides 101, HDL 43, LDL 100. Her peak flows have been 300 to 400. Stress test was as described above. Cardiovascular is regular rate and rhythm. Pulmonary is clear to auscultation bilaterally. Extremities are without cyanosis, clubbing, or edema.

**ASSESSMENT/PLAN:**

This is a 44-year-old female, as above, diabetes mellitus. Although this is under improving control manifested by her hemoglobin A1c and improving daily capillary blood glucoses, she still is a bit high. Consequently, we will increase her Glucophage today adding the 500 milligrams by mouth each noon dose. She will return to the clinic in two months, and we will reassess this at that time. **Likewise, the patient's blood pressure is under good control today with a rate of 111/67. Her lipids are under good control**. Today she is dissatisfied because she continues to walk and has not been losing any weight. I reassured her today that although she is not losing weight, we are doing everything we can and enjoying pretty good results in terms of controlling her hypertension, diabetes mellitus, and hyperlipidemia. I encouraged her to keep walking and explained that even though she is exercising and keeping her weight stable without losing anything, she should continue to pursue this.

Tr. 228 (emphasis added).

On February 4, 2004, a physician at Kirtland AFB Internal Medicine Clinic evaluated Edgell. Tr. 152. The medical record indicated Edgell presented to Kirtland AFB for a follow up of her diabetes and was a "new patient." *Id.* Edgell complained of back pain and reported her asthma was stable. The physician noted Edgell was obese. The physician noted, "feet with no sensation to monofilament, no edema." The physician assessed Edgell with musculoskeletal back pain and recommended a trial of Robaxin (muscle relaxant) and Tylenol as needed. The physician noted Edgell's diabetes questioning whether it was controlled. The physician counseled Edgell on foot protection and directed Edgell to return in two weeks for a review and a complete profile. On this day, Edgell's **urine glucose test was negative**.

On February 18, 2004, a provider noted Edgell should have a follow up in 1-2 weeks for her diabetes or as needed for her asthma. Tr. 150. The provider also ordered lab work.

On February 23, 2004, Edgell returned to Kirtland AFB Internal Medicine Clinic for her diabetes follow up.  Tr. 148.  Edgell complained of problems with her left great toe and increased asthma symptoms.  Erick R. Goldman, M.D., assessed Edgell with (1) infected ingrown toe nail; (2) uncontrolled diabetes with neuropathy; and (3) asthma.  Dr. Goldman noted Edgell's elevated LDL's (low density lipoprotein) and elevated SGOT and SGPT (liver function tests).  Dr. Goldman also noted Edgell's asthma was improved.  Dr. Goldman prescribed Plavix (antithrombotic).

On May 3, 2004, an x-ray report indicated Edgell had a normal right knee.  Tr. 147.  The report noted Edgell had complained of "bilateral knee pain, left greater than the right, and was status post ACL (anterior cruciate ligament) reconstruction on left in 2001."  *Id.*

On August 4, 2004, Edgell requested a referral for physical therapy for her low back pain.  Tr. 290.  At that time, the health care provider noted, "44 female with hx of well controlled DM-2 and NSAID (non-steroidal anti-inflammatory drug) allergy with low back pain."  *Id.*  Edgell's request was approved for HealthSouth.

On August 6, 2004, John Veitch, M.D., saw Edgell at the Ortho Clinic "for evaluation of EMG and nerve conduction tests of her right and left hands."  Tr. 155.  Edgell had had "previous carpal tunnel release . . . ."  *Id.*  Dr. Veitch recommended an MRI of the cervical spine "for completion."  *Id.*  Dr. Veitch directed Edgell to return after the MRI result were completed.

On September 1, 2004, Edgell received physical therapy at HealthSouth.  Tr. 154.  Edgell complained of "sudden onset of lower back pain July 2004."  *Id.*  Edgell reported she had constant lower back pain that worsened with ambulation and prolonged sitting with decreased range of motion of the lumbar spine secondary to pain.

On September 17, 2004, Edgell returned to Kirtland AFB Internal Medicine Clinic and requested a referral to an orthopedic doctor at a different hospital.  Tr. 163.  Dr. Vega reviewed Edgell's cervical MRI which showed a "small central disc protrusion at C4-5 and C6-7 with no foraminal narrowing or spinal stenosis."  Dr. Vega noted:  "Pt reports that she occasionally drops things.  Report normal EMG studies of upper extremities."  Dr. Vega's examination indicated upper extremities strength 3/5 with no sensory defects.  Dr. Vega assessed Edgell with "upper extremity weakness" and noted "that orth would have very little options to offer her given her MRI results."  *Id.*  Dr. Vega also noted "best option is physical therapy for strengthening."  *Id.*  Dr. Vega referred Edgell for physical therapy and advised her to return as needed.

On September 22, 2004, Edgell was authorized to receive physical therapy at UNM for her arms and knees.  Tr. 162.  Edgell requested she be sent to HealthSouth since she was already receiving physical therapy there.

On September 24, 2004, Edgell went to Kirtland AFB Internal Medicine Clinic with complaints of "right sided pain that traveled to her stomach, burning sensation."  Tr. 161.  Dr. Vega noted Edgell had "a fatty liver with recent G.I. evaluation."  Dr. Vega also noted Edgell had a "**recent abdominal and pelvic CT which was negative**."  The **examination was essentially normal**.  Dr. Vega directed Edgell to continue taking Motrin 800 mg four times a day as needed.

On October 5, 2004, Edgell called Kirtland AFB Internal Medicine Clinic requesting a renewal of her prescription for Motrin 800 mg.  Tr. 146.  **Edgell reported the Motrin was "controlling her pain well**."  *Id.*  Dr. Vega renewed the prescription.

On October 13, 2004, Edgell returned for physical therapy for "generalized deconditioning."  Tr. 153.  Edgell reported having right lower back pain.

On October 29, 2004, Dr. Vega evaluated Edgell for complaints of shortness of breath and left arm numbness.  Tr. 159, 160.  Edgell had been to the emergency room the previous Thursday and had been diagnosed with esophagitis.   Dr. Vega diagnosed Edgell with GERD excerbation and directed her to increase the Protonix (used for the treatment of GERD)  to 40 mg twice a day.  Dr. Vega also directed Edgell to return in two weeks if she was not better.

On November 22, 2004, Edgell called Kirtland AFB Internal Medicine Clinic requesting an appointment because she was having "back problems."  Tr. 145.  Edgell reported she was having lower back pain "radiating to her right side for the past couple of days."  *Id.*  The health care provider advised Edgell to seek medical care at an urgent care center or an emergency room if she felt it was necessary because there were no appointments available that day.

On December 6, 2004, Edgell returned to see Dr. Vega for a follow up of her visit to urgent care in November.  Edgell reported she continued to have low back pain with pressure on the bladder.  Edgell also reported she was taking aspirin with no problems and had stopped the Plavix.  **The physical examination showed negative straight leg raise and some pain with palpation.  The examination of the abdomen was essentially normal (normal bowel sounds, no guarding, no rebound) with pain in the right groin**.  Dr. Vega diagnosed Edgell with mechanical low back pain and prescribed Mobic (nonsteroidal anti-inflammatory drug) and Percocet (narcotic pain medication–  brand name for the combination of acetaminophen (Tylenol) and oxycodone) every 4-6 hours as needed.  Dr. Vega assessed Edgell's right groin pain as "musculoskeletal strain."  **Edgell's urine test was negative for glucose**.

On December 7, 2004, Edgell called Kirtland AFB to report she was having nausea after taking Mobic.  Dr. Vega had prescribed Mobic the previous day for lower back pain.

15

On December 9, 2004, Edgell called Kirtland AFB because she had not received a call from Dr. Vega regarding her December 7th call.  Tr. 143.  Dr. Vega called Edgell and advised her to discontinue the Mobic.

On December 17, 2004, a health care provider at Kirtland AFB Internal Medicine Clinic noted Mr. Edgell had called regarding a prescription refill for oxycodone.  Mr. Edgell reported the oxycodone was working well for his wife and requested a refill.  Mr. Edgell also reported the Motrin was no longer helping his wife and wanted guidance as to what she could take.  Dr. Vega prescribed Relafen 500 mg (nonsteroidal anti-inflammatory drug) twice a day as needed and renewed the prescription for Percocet.

On January 6, 2005, Edgell presented to the Internal Medicine Clinic at Kirtland with complaints of "upper torso muscle spasms/flutters x 2-3 weeks, no SOB (shortness of breath), pulse increases."  Tr. 289.  Dr. Vega noted "family reports pt with increased anxiety/depression." *Id.*  Dr. Vega diagnosed Edgell with (1) viral URI (upper respiratory infection), (2) "upper torso pain secondary to tension – observe for resolution" and (3) anxiety/depression.  *Id.*

On January 18, 2005, Edgell returned to the Internal Medicine Clinic at Kirtland with complaints of "clogged ears x 3 days."  Tr. 286-287.  Dr. Vega diagnosed Edgell with otitis media and prescribed antibiotics.

On February 23, 2005, Dr. Vega evaluated Edgell for "multiple complaints."  Tr. 284.  Edgell complained of left knee and back pain, swollen knee, asthma, and bumps on her left foot.  Dr. Vega noted there was pain to palpation in the lower left extremity around the calf area.  Dr. Vega referred Edgell to a vascular specialist to rule out DVT (deep vein thrombosis).

On March 16, 2005, Edgell returned for a follow up of her pneumonia.  Tr. 282.  Edgell had been seen at Urgent Care and found to have pneumonia which was treated with antibiotics.  Edgell reported having trouble breathing but denied fever, chills, nausea or vomiting.  Dr. Vega diagnosed Edgell with "asthma exacerbation" and "history [of] depression."  *Id.*  Dr. Vega directed Edgell to call or return in one week if she was not better.  Tr. 283.

On April 19, 2005, Edgell returned to see Dr. Vega.  Tr. 279.  Edgell complained of fatigue and daytime somnolence.  Dr. Vega referred Edgell for a sleep study.

On July 14, 2005, Edgell went to Albuquerque Medical.  Tr. 303.  The health care provider noted: "new pt to establish– trying to get disability."  *Id.*  Edgell reported having lower back pain, neck pain, left knee pain, and insomnia secondary to lower back pain.  The physician performed an examination which was essentially normal except the examination of the abdomen revealed "tender right upper quadrant" and a **mild decrease in sensation of the feet**.  The physician ordered an MRI of the lower spine, laboratory work, and referred Edgell for an eye evaluation.

On August 5, 2005, Edgell had an MRI of the lower spine.  Tr. 306.  The MRI indicated "a small right foraminal disc protrusion at level of L5-S1, with minimal foraminal stenosis.

On August 8, 2005, Edgell's laboratory results showed high SCOT and SGPT (liver function tests) levels.  Tr. 304.  Edgell's cholesterol and LDL levels were also elevated.

On August 9, 2005, Edgell returned to Albuquerque Medical for her MRI results and for a follow up.  Tr. 302.  A physician assistant (PA) evaluated Edgell.  Edgell reported her blood sugar readings had been "really high" but failed to bring her records.  The PA assessed Edgell as

having diabetes mellitus– uncontrolled and prescribed Avandia 8 mg every day.  The PA directed

Edgell to return in 2-3 days to review her lab work and MRI.

On August 11, 2005, Edgell returned to Albuquerque Medical for her MRI and lab results.

Tr. 301A.  The same PA evaluated Edgell.  Edgell's records showed blood sugar levels ranging

from 160 to 420 with averages of approximately 200.  The PA discussed the importance of diet,

exercise, and weight loss.  The PA continued the Avandia and directed her to return in six weeks.

As far as the elevated LFTs, the PA referred Edgell for an evaluation to rule out a fatty liver.  The

PA also referred Edgell to New Mexico Spine for her back pain.

On August 17, 2005, Edgell had an ultrasound of the abdomen due to elevated LFT's and

right upper quadrant pain.  Tr. 307.  Due to her "very large body habitus," the study of the liver

was very limited and there was no evidence of gallbladder disease.

On August 17, 2005, Edgell also returned to Albuquerque Medical with complaints of

nausea and "reactions to Avandia."  Tr. 301.  Edgell reported having headaches and exacerbation

of her GERD.  The health care provider directed Edgell to discontinue the Zetia (used to reduce

cholesterol) and the Glucophage (used in the treatment of diabetes).  The health care provider

prescribed Lantus (insulin) 20 IU at bedtime and provided patient education.

## B.  ALJ's Reliance on Vocational Expert's  (VE) Testimony

"'Testimony elicited by hypothetical questions that do not relate with precision all of a

claimant's impairments cannot constitute substantial evidence to support the Secretary's

decision.'"  *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991)(quoting *Ekeland v. Bowen,*

899 F.2d 719, 722 (8th Cir. 1990).  However, hypothetical questions need not take into account

all of claimant's alleged impairments.  Questions to a VE are proper when they take into account

the impairments substantiated by the medical reports and the impairments accepted as true by the

ALJ.  *See Gay v. Sullivan,* 986 F.2d 1336, 1340-41 (10th Cir. 1993); *Talley v. Sullivan*, 908 F.2d

585, 588 (10th Cir. 1990).  Moreover, a claimant's testimony alone cannot establish a

nonexertional impairment.  *Hamilton v. Secretary of Health and Human Servs.*, 961 F.2d 1495,

1499 (10th Cir. 1992); *see also*, *Talley v. Sullivan*, 908 F.2d at 587(subjective complaints alone

insufficient to establish disabling pain); *Brown v. Callahan*, 120 F.3d 1133, 1135 (10th

Cir.1997)(Although the ALJ must consider plaintiff's subjective complaints, the ALJ does not

have to accept them as true.).

In her decision the ALJ found:

> The non-examining State agency physician who reviewed the documentary evidence at the initial and reconsideration levels of administration review opined that the claimant could perform light work and return to her past relevant work as she performed it. (Exhibit 1F/91).

> The claimant has had symptom-producing medical problems from her work accident and motor vehicle accident, but the undersigned finds that her testimony and other evidence do not credibly establish functional limitations to preclude her from all sustain (sic) work activity. First of all, the claimant alleged upper extremity pain but this problem was resolved with bilateral forearm fasciotomies in 1990 and has never been mentioned as a medical issue or symptom by her treating source.  The claimant also had left knee reconstruction in 2001 and reached maximum medical improvement and was released to return to work in May of 2002. Then in August of 2002, Dr. Altman, claimant's orthopedist, stated that the claimant's reason for not returning to work at that time was not due to her knee but her diabetes and asthma. The undersigned notes that her treating source did not document the claimant's complaints of incapacitating knee and upper extremity pain until 2005 and this would have been noted repeatedly in the record if it had been an issue of concern.

Tr. 16.  Substantial evidence supports the ALJ's findings.

Edgell contends the ALJ erred in relying on the VE's testimony to meet her burden at step

five of the sequential evaluation process because the ALJ failed to include her manipulative

impairment in her hypothetical to the VE.  Edgell asserts her manipulative impairment is clearly

supported by the record and cites to the transcript, specifically, pages 86, 93-94, 130, 155, and

315, to support her assertion.  Page 86 is part of a "Disability Report– Adult" in which Edgell

states "CAN'T WRIGHT (sic) LIFT 10 LBS ONLY, CAN'T HOLD UNTO THINGS, PICK

THINGS UP, . . . ."  Tr. 86.  Pages 93 and 94 are part of the "Disability Supplemental Interview

Outline."   The only applicable statements found on pages 93 and 94 are "can't write or type

because of hand pain" and "can't left (sic) or hold items, . . . ."  Tr. 93-94.  Pages 130 and 133 are

part of the "Daily Activities Section" Edgell completed and state, "Hard to button, so I wear

pullover shirts" (Tr. 130) and "My hands would have started hurting if I had to write (Tr. 135)."

Page 155 is a "Final Report" from the Orthopedic Clinic at University Hospital.  Dr. Veitch noted

Edgell reported having "pain with the arms in an overhead position and flexion/extension about

the palm and hand areas."  Tr. 155.  The reports also states that the **results of the EMG and

nerve conduction tests were normal**.  *Id.*.  Because the EMG and nerve conduction tests were

normal, Dr. Veitch recommended an MRI of the cervical spine to rule out a thoracic outlet

problem.

On September 17, 2004, Dr. Vega reviewed Edgell's cervical MRI which showed a "small

central disc protrusion at C4-5 and C6-7 with **no foraminal narrowing or spinal stenosis**."  Tr.

163.  Dr. Vega noted:  "Pt reports that she occasionally drops things.  Report **normal EMG**

studies of upper extremities."  *Id.*  Dr. Vega's neurological examination indicated "upper

extremities strength **3/5 with no sensory defects."**  *Id.*  Dr. Vega assessed Edgell with "**upper

extremity weakness**" and noted "**that orth would have very little options to offer her given

her MRI results**."  *Id.*  Dr. Vega also noted "**best option is physical therapy for

strengthening**."  *Id.*  Dr. Vega referred Edgell for physical therapy and advised her to return as

needed.

Therefore, the MRI of the cervical spine **does not support** Edgell's assertion that "the MRI of the cervical spine . . . revealed clinical findings supporting her symptoms."  Pl.'s Mem. in Support of Mot. to Remand at 8.  Accordingly, because Edgell's "manipulative impairment" is not substantiated by the medical record, the ALJ did have to include it in her hypothetical question to the VE.

Next, Edgell claims "[t]he ALJ's reliance on the VE's testimony to find her not disabled was error" because the "VE was required to give the DOT (Dictionary of Occupational Titles) paragraph numbers for the jobs she identified."  Pl.'s Mem. in Support of Mot. to Remand at 10. Accordingly, Edgell argues "there is no basis upon which [she] can contest the manipulative requirements of the jobs identified by the VE, because the VE did not properly identify the jobs." *Id.* at 11.  Because the Court already found that Edgell's "manipulative impairment" is not substantiated by the medical record, this argument is without merit.  Moreover, at the hearing Edgell's counsel specifically asked the VE the following questions:

ATY:   What kind of use, fine manipulative use is required in these jobs– all of them?

VE:     Well–

ATY:   Starting with the first one. The first one was a surveillance systems monitor.

VE:     That would probably be considered more fingering, working with a computer.

ATY:   Okay.  So that would require use.

VE:     Yes.

ATY:   The next one is an order clerk.

VE:     Let's see.  I'm having a hard time finding that one right now, but I would say that would also– okay– work involves handling and fingering.

ATY:   Okay.  And then the dispatcher?

VE:    And that would also involve some handling and fingering.

ATY:   Okay.  And the other ones were the solicitor– you said telephone solicitor, I think you

        said?

VE:    Yes, that's correct.  And that would involve the same fingering.

ATY:   Assembler, and then the hand packager?  What were the other two?

VE:    The assemble would require handling, fingering.  It could involve some reaching in the

        immediate area depending on the position, and then the other one was–

ATY:   Hand packager.

VE:    Hand packer.

ATY:   Packager or packer?

VE:    Hand packer.

ATY:   Okay.

VE:    Handling, fingering, could be constant fingering, and there could be some reaching

        depending on the kind of job in front of them.

Tr. 334-335.  Thus, the VE testified that all the listed jobs required fingering and/or handling.  It

is unclear to the Court exactly what Edgell wants to contest given the VE's testimony.

Finally, Edgell claims the VE erred when she failed to "provide the number of jobs that are available in this region for the occupations she identified for [her]." *Id.* Edgell contends the "ALJ must make a finding of the numerical significance." *Id.* The pertinent regulation states:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "**work which exists in the national economy**" **means work which exists in significant numbers <u>either</u> in the region where such individual lives <u>or</u> in several regions of the country**.

42 U.S.C. §423(d)(2)(A)(emphasis added); *see also*, 20 C.F.R. §404.1560(c)(1)("Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).").  Section 404.1466 also states:

> **Work which exists in the national economy.**
> (a) *General.* We consider that work exists in the national economy when it exists in significant numbers **<u>either</u> in the region where you live <u>or</u> in several other regions of the country**.  It **does not matter** whether–
> (1) **Work exists in the immediate area in which you live**;
> (2) A specific job vacancy exists for you; or
> (3) You would be hired if you applied for work.
> (b) *How we determine the existence of work.* Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirement which you are able to meet with your physical or mental abilities and vocational qualifications.  Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy."  We will not deny you disability benefits on the basis of the existence of these kinds of jobs.  If work that you can does not exist in the national economy, we will determine that you are disabled.  However, if work that you can do does exist in the national economy, we will determine that you are not disabled.
> (c) *Inability to obtain work.* We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do **work which exists in the national economy**, but you remain unemployed because of–
>
> (1) Your inability to get work;
> (2) **Lack of work in your local area**;
> (3) The hiring practices of employers;
> (4) Technological changes in the industry in which you have worked;

(5)     Cyclical economic conditions;
(6)     **No job openings for you**;
(7)     You would not actually be hired to do work you could otherwise do; or
(8)     You do not wish to do a particular type of work.

20 C.F.R. §404.1566 (emphasis added).

In *Trimiar v. Sullivan,* 966 F.2d 1326 (10th Cir. 1992), the Tenth Circuit addressed this

issue, noting:

> This Circuit has never drawn a bright line establishing the number of jobs necessary to constitute a "significant number" and rejects the opportunity to do so here.  Our reluctance stems from our belief that each case should be evaluated on its individual merits. Notwithstanding our reluctance, we note that several factors go into the proper evaluation of significant numbers.  The Eighth Circuit has succinctly stated these factors:
>
>> A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on.
>
> The decision should ultimately be left to the [ALJ's] common sense in weighing the statutory language as applied to a particular claimant's factual situation.

*Id.* at 1330 (internal citations and quotations omitted).

In this case, the ALJ posed the following questions.

ALJ:   Counsel, did you have the opportunity to review the professional qualifications of Ms.

Weber prior to the hearing?

ATY:  Yes, I did.

ALJ:   And are you willing to stipulate to her qualifications – her ability to testify?

ATY:  Yes, Your Honor.

ALJ:   Okay.

ALJ:   We sent you various vocationally relevant documents concerning the claimant prior to the

hearing.  Have you had the opportunity to review those records?

24

VE:     Yes, I did, Your Honor.

ALJ:    And you heard the testimony about her past work.  Are there any additional questions you'd like me to ask to clarify the record or testimony?

VE:     I don't think so, Your Honor.

ALJ:    Okay, I want you to assume the following hypothetical.  I want you to assume an individual who is the same age, with the same education, and the same work history as the claimant, and consider the following limitations.  This individual would not be able to walk for more than a mile, and within that walk would not be able to marching (sic), but would have to stop, you know, frequently and then continue before having to stop all together. This individual can sit anywhere from 5 to 20 minutes at a time, and can stand for 10 minutes at a time.  She cannot do any work that would require her to reach overhead or to do work that would require her to have her arms stretched out in front of her for the full work day.  She would not be able to do any job in any atmosphere where there were chemicals, dust, smoke, would have to be fairly pristine environment, in other words.  This individual would not be able to do any work that would require her to lift more than would be in a sedentary type job, 10 pounds or less.  Are there any jobs that exist in significant numbers in the national economy such a person could do?

VE:     I'll try to find those, Your Honor.

ALJ:    Okay.

VE:     I would say **surveillance systems monitor**, which is considered to be a sedentary position, and it is an SVP of two, and there usually is no reaching or significant handling, and there are usually about **50,000** of those nationally available.  An **order clerk** which is

a sedentary job.[1]  It's an SVP of two, and there are usually **155,000** of these kind of jobs.

**Dispatcher** which is sedentary, and SVP of three, and there are usually **33,000** of these jobs available within the U.S.

ALJ:    How many?

VE:     **33,000**.

ALJ:    Okay.

VE:     A **telephone solicitor**, which is a sedentary position.  It's an SVP of three, and there are usually **486,000** of these jobs available nationally.

ALJ:    How many?  Say that again.

VE:     In number, Your Honor?

ALJ:    Yes.

VE:     **486,000**.

---

[1] The VE also testified the order clerk job was found "in a hotel or a service industry type of thing" and "this particular job is in a hotel or eating establishment."  Tr. 336-337.  The DOT number for the order clerk job is 209.567-014 and is described as follows:

**ORDER CLERK, FOOD AND BEVERAGE(hotel & rest.)**
Takes food and beverage orders over telephone or intercom system and records order on ticket: Records order and time received on ticket to ensure prompt service, using time-stamping device.  Suggests menu items, and substitutions for items not available, and answers questions regarding food or service.  Distributes order tickets or calls out order to kitchen employees.  May collect charge vouchers and cash for service and keep record of transactions.  May be designated according to type of order handled as Telephone-Order Clerk, Drive-In (hotel & rest.); Telephone-Order Clerk, Room Service (hotel & rest.).

DOT, Vol. II, App. C, 180 (4th ed. Rev.1991).

Tr. 331-333. Thus, the VE identified **724,000** sedentary jobs nationally available to Edgell. The ALJ found this number to be a significant number of jobs in the national economy that Edgell could perform.

In this case, Edgell lives in Albuquerque (Tr. 55), and she does not argue that the jobs the VE listed are isolated and unavailable to her. However, Edgell argues *Trimiar* requires the Commissioner to show there are significant number of jobs in the "**local economy**" not the national economy. Pl.'s Mem. in Support of Mot. to Remand at 11 and Pl.'s Reply at 3. The Court disagrees.

In *Trimiar*, the VE testified that Mr. Trimiar could perform work in three unskilled jobs: escort driver, recreational facility attendant, and telephone solicitor. *Trimiar*, 966 F.2d at 1330. The VE also testified that 650 to 900 such jobs existed in the state of Oklahoma. *Id.* Based on the VE's testimony, the ALJ found "these jobs exist in substantial numbers in the region in which [Mr. Trimiar] resides and in the national economy." *Id.* Mr. Trimiar disagreed. In addressing the issue raised by Mr. Timiar, the Court of Appeals for the Tenth Circuit had to address what constituted a "significant number" for purpose of the statue [42 U.S.C. §423(d)(2)(A)]. The *Trimiar* Court declined to draw a bright line establishing the number of jobs necessary to constitute a "significant number" believing each case should be evaluated on its individual merits. *Trimiar*, 966 F.2d at 1326. Significantly, the *Trimiar* Court also did not hold that an "ALJ needs to have state-specific numbers" in order to meet the ALJ's burden at step five as Edgell contends. Rather, the *Trimiar* Court left the decision to "the ALJ's commonsense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.* Moreover, the statutory

language does not support Edgell's argument.  *See* 42 U.S.C. §423(d)(2)(A); 20

C.F.R.§404.1466; 20 C.F.R. §404.1560(c)(1).

     After carefully reviewing the transcript of the hearing and the applicable regulations, the

Court finds that the ALJ decision is supported by substantial evidence.  Considering the types of

jobs listed by the VE, i.e, jobs typically found in large cities, the total number of jobs available

(724,000) nationally, the size of the city in which Edgell resides, and her RFC, the Court finds

that this number is significant.  Moreover, the ALJ considered the factors set forth in *Trimiar*.

First, the ALJ considered and included those impairments supported by the record in her

hypothetical question to the VE (Tr. 332), questioned the VE regarding her qualifications (Tr.

331), and posed questions regarding whether the vocational base would be significantly reduced

with a sit and stand-at-will requirement (Tr. 336-337).

     Finally, the Court notes that Edgell was represented by counsel at the hearing.  If counsel

believed the DOT number for the jobs the VE identified were required and believed the Tenth

Circuit Court of Appeals held in *Trimiar* that an ALJ needs to have "local economy" or "state-

specific" numbers at step five before finding a significant number of jobs exist, counsel should

have elicited this type of information from the VE at the administrative hearing.  *Cf. Gibbons v.

Barnhart*, 85 Fed.Appx. 88, 93 (10th Cir. 2003), quoting *Carey v. Apfel*, 230 F.3d 131, 146-147

(5th Cir. 2000)("[C]laimants should not be permitted to scan the record for implied or

unexplained conflicts between specific testimony of a [VE] and the voluminous provisions of the

DOT, and then present that conflict as reversible error, when the conflict was not deemed

sufficient to merit adversarial development in the administrative hearing.")

**C.  Obesity**

Edgell contends the ALJ did not analyze how her weight has affected her functioning in violation of Social Security Ruling 02-1p.  Social Security Ruling 02-1p states in pertinent part:

> How Do We Evaluate Obesity in Assessing Residual Functional Capacity in Adults and Functional Equivalence in Children?
>
> Obesity can cause limitation of function.  The functions likely to be limited depend on many factors, including where the excess weight is carried.  An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching.  The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

SSR 02-1p, 2000 WL 628049, *6 (2000).  The ALJ considered Edgell's obesity noting Edgell could take care of her personal needs, required help from her husband to cook and do housework, was able to walk a mile a day for her daily exercise, did some shopping, folded some clothes, had left knee reconstruction and was released to return to work in 2002, and sat for 45 minutes at the hearing without standing.  Tr. 16.  Furthermore, the ALJ's hypothetical to the VE included all the limitations supported by the record which were impacted by her obesity, i.e., could not walk for more than a mile, could not march, would have to stop frequently when walking, could sit anywhere from 5 to 20 minutes at a time, could stand for 10 minutes at a time, could not do any work that would require her to reach overhead or to do work that would require her to have her arms stretched out in front of her for the full work day, would have to work in a pristine environment, and could only perform a sedentary job.  Tr. 332.  These findings comport with Social Security Ruling 02-1p.

**D.  Conclusion**

It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994).  The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied. After such review, the Court is satisfied that substantial evidence supports the ALJ's finding of nondisability.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**